1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                        **DISTRICT OF OREGON**

10                       **PORTLAND DIVISION**

11

12  **DAVIS WINE COMPANY,** a           )
    Partnership, and **DAVIS WINE**     )
13  **IMPORTS, LLC,**  a California      )   03:10-cv-00650-HU
    Limited Liability Company,          )
                                        )   **OPINION AND ORDER**
14                    Plaintiff,        )
                                        )
15        v.                            )
                                        )
16  **VINA Y BODEGA ESTAMPA, S.A.,**    )
    a Chilean Company,                  )
17                                      )
                      Defendants.       )
18  _____    )

19

20  Darian Stanford
    Phil Nelson
21  Jason Hirshon
    SLINDE NELSON LLC
22  111 SW 5th Avenue, Suite 1740
    Portland, Oregon 97204

23        Attorneys for Plaintiff

24

25  Alison Rhodes
    Judith Parker
26  HINSHAW & CULBERTSON LLP
    1000 SW Broadway, Suite 1250
27  Portland, OR 97205

28        Attorneys for Defendant


OPINION AND ORDER

HUBEL, Magistrate Judge:

## Opinion and Order

Currently before the court is defendant Vina Y Bodega Estampa, S.A.'s ("Estampa") motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c) or, alternatively, to dismiss plaintiff Davis Wine Company's ("DWC") claims for breach of the implied covenant of good faith and fair dealing, breach of implied contract, and unjust enrichment pursuant to Rule 12(b)(6). All parties have consented to entry of final judgment by a Magistrate Judge in accordance with Rule 73 and 28 U.S.C. § 636(c). For the reasons set forth below, Estampa's motion [36] for summary judgment or, in the alternative, to dismiss DWC's claims for breach of the implied covenant of good faith and fair dealing, breach of implied contract, and unjust enrichment, is DENIED.

## Background

Davis Wine Imports, LLC ("Davis LLC") originally filed this action in the Multnomah County Circuit Court for the State of Oregon on July 20, 2009. (Notice of Removal ¶ 1.) In its complaint, Davis LLC brought claims against Estampa for breach of contract and breach of the covenant of good faith and fair dealing. (Notice of Removal Ex. 1 at 5-8.) Estampa was served with Davis LLC's summons and complaint on May 27, 2010. (Notice of Removal ¶ 1.) Estampa then removed the case to federal court on June 8, 2010. (Notice of Removal at 1.)

On July 28, 2010, Estampa filed its first motion for summary judgment arguing that Davis LLC did not exist as an entity at the time the parties entered into the contract. (Defs.' Mem. Supp. (doc. #12) at. 1-10.) Estampa also argued that the contract was

not valid under California law because the parties were not capable of contracting with one another. (Defs.' Mem. Supp. (doc. #12) at 10.) Rather than responding to the motion for summary judgment, on August 16, 2010, Davis LLC filed a motion for joinder, leave to amend, and for an extension of time to respond to Estampa's motion for summary judgment. (Doc. #16.) Davis LLC sought to amend the complaint to join DWC. (Decl. Phil Nelson Ex. A at ¶ 2.)

The court granted Davis LLC's motion for joinder and leave to amend since the record was insufficient to determine if the partnership continued to exist after the formation of the LLC. (Doc. #28 at 10.) Thus, it was premature to address Estampa's motion for summary judgment. (Doc. #28 at 10.) On April 1, 2011, Davis LLC and DWC (collectively "Plaintiffs") submitted their First Amended Complaint ("FAC") against Estampa. (FAC at 1.)

The following are facts as alleged in Plaintiffs' FAC: DWC is a domestic partnership formed in 2003 between brothers German and Sebastian Bistue and their father, Cesar Bistue (collectively "the Bistues"). (FAC ¶ 2.) DWC conducts business in Portland, Oregon. (FAC ¶ 2.) Davis LLC is a domestic wine importing company formed in September 2008 by the Bistues, which also conducts business in Portland, Oregon. (FAC ¶ 3.) Estampa is a foreign corporation with its principle place of business in Santiago, Chile. (FAC ¶ 4.)

DWC is a federally licensed importer, marketer and distributor of international wine throughout the United States. (FAC ¶ 6.) In December 2007, DWC entered into negotiations with Estampa for an exclusive right to import, market and distribute Estampa wine nationwide. (FAC ¶ 7.) Prior to executing a contract, DWC

OPINION AND ORDER                    3

1  notified Estampa that they were in the process of reorganizing as
2  a limited liability company, *e.g.*, Davis LLC.  (FAC ¶ 7.)  DWC
3  requested that Davis LLC, not DWC be the party to the contract on
4  January 4, 2008. (FAC ¶ 7; Decl. Cesar Bistue ¶ 8.)  DWC notified
5  Estampa that it would be approximately five or six months before
6  the transition from DWC to Davis LLC would be complete.  (FAC ¶ 7.)

7      On  January  7,  2008,  DWC  executed  an  "Importation  and
8  Represtation [sic] Agreement" with Estampa ("the Agreement") in the
9  name of the to-be-formed company, Davis LLC.  (FAC ¶ 8.)  The
10  parties allegedly understood and agreed that DWC would perform all
11  obligations under the Agreement and would be entitled to all of the
12  benefits under the Agreement "until and unless" Davis LLC was
13  formed.  (FAC ¶ 8.)  DWC claims that all pre-agreement and post-
14  agreement correspondence between the parties were addressed to DWC,
15  and all invoices and purchases orders issued pursuant to the
16  Agreement were in DWC's name.  (FAC ¶ 9.)  Estampa also issued a
17  press release and a notice to all its distributors listing DWC as
18  its official importer.  (FAC ¶ 9.)

19      German Bistue is DWC's director of marketing and served as
20  Estampa's main contact.  (FAC ¶ 11.)  The majority of DWC's
21  marketing  activity  and  negotiations  were  conducted  from  its
22  Portland office, which is the national sales headquarters. (FAC ¶
23  11.)  On or about February 12, 2008, Marie Chaisson, a
24  representative of Estampa, met with German Bistue at DWC's Portland
25  office.  (FAC ¶ 12.)  During this meeting, Estampa and DWC
26  discussed logistics of DWC's exclusive distribution of Estampa
27  wines in Oregon and the United States.  (FAC ¶ 12.)

28      DWC submitted three purchase orders to Estampa: "PO 237, PO

OPINION AND ORDER            4

238, and PO 242" on February 28, 2008.  (FAC ¶ 13.)  Estampa
refused to accept these purchase orders despite the Agreement. (FAC
¶ 13.)  Estampa allegedly insisted on DWC purchasing their entire
inventory of wine stored by Western Carriers at multiple locations
in the United States in a single purchase order rather than over
time.  (FAC ¶ 13.)  On or about March 18, 2008, Estampa sent two
invoices to DWC and DWC submitted three new Purchase Orders: PO
249, PO 250, and PO 251.  (FAC ¶ 14.)  PO 249 governed the purchase
of Estampa's inventory of wine stored by Western Carriers in
California.  (FAC ¶ 14.)  PO 250 covered the purchase of Estampa's
inventory of wine stored by Western Carriers in New Jersey, and PO
251 dealt with the purchase of Estampa wine directly from Chile.
(FAC ¶ 14.)

On March 20, 2008, DWC was scheduled to receive the Estampa
wine from California under PO 249, but it never arrived.  (FAC ¶
15.)  Soon thereafter, Estampa informed DWC that they would not
ship any inventory and would not honor the invoices.  (FAC ¶ 15.)
Estampa's reason for this action was that a third-party insurer,
Coface, refused to insure DWC.  (FAC ¶ 16.)  DWC claims that the
Agreement did not require them to use any particular insurer.  (FAC
¶ 16.)  Nevertheless, Estampa informed DWC that they intended to
terminate the Agreement.  (FAC ¶ 16.)

DWC claims that its customers had already placed substantial
orders for Estampa wines and, due to Estampa's breach of the
Agreement, they were unable to deliver on these orders.  (FAC ¶
17.)  On April 3, 2008, DWC sent Estampa's CEO, Miguel Gonzales
Ortiz , a letter detailing Estampa's alleged breaches and demanding
that Estampa comply with the Agreement.  (FAC ¶ 18.)  On April 14,

OPINION AND ORDER                5

2008, Estampa responded by formally terminating the Agreement based on what Ortiz characterized as "lack of mutual trust." (FAC ¶ 19.) Five months later, on September 5, 2008, Davis LLC was registered under California law. (FAC ¶ 20.) Plaintiffs bring claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of implied contract, and unjust enrichment against Estampa.[1] (FAC ¶¶ 21-43.)

Estampa brought the motion that is currently before the court. (Defs.' Mot. Summ. J. (doc. #36) at 1.) Estampa's memorandum raised arguments pertaining to the sufficiency of the claims alleged by both Davis LLC and DWC. (Defs.' Mem. Supp. at 5-18.) Plaintiffs conceded the motions against Davis LLC and withdrew all claims made on its behalf. (Pl.'s Opp'n at 11.) Accordingly, the court will address the only remaining claims in this case, DWC's claims.

## Standard

### I. __Motion for Summary Judgment__

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is not proper if factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

---

[1] Plaintiffs's claims are brought on behalf of DWC or, alternatively, Davis LLC.

OPINION AND ORDER          6

U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id.* at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits.  The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e).  The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

OPINION AND ORDER                7

quotation marks omitted).

**II.  Rule 12(b)(6) Motion to Dismiss**

Rule 12(b)(6) allows a court to dismiss a complaint for failure to state a claim upon which relief can be granted. In considering a Rule 12(b)(6) motion to dismiss, the court must accept all of the claimant's material factual allegations as true and view all facts in the light most favorable to the claimant. *Reynolds v. Giusto*, No. 08-CV-6261, 2009 WL 2523727, at *1 (D. Or. Aug. 18, 2009). The Supreme Court addressed the proper pleading standard under Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *Twombly* established the need to include facts sufficient in the pleadings to give proper notice of the claim and its basis:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* at 555 (brackets omitted).

Since *Twombly*, the Supreme Court has clarified that the pleading standard announced therein is generally applicable to cases governed by the Rules, not only to those cases involving antitrust allegations. *Ashcroft v. Iqbal*,---U.S.---, 129 S. Ct. 1937, 1949 (2009). The *Iqbal* court explained that *Twombly* was guided by two specific principles. First, although the court must accept as true all facts asserted in a pleading, it need not accept as true any legal conclusion set forth in a pleading. *Id.* Second, the complaint must set forth facts supporting a plausible claim for relief and not merely a possible claim for relief. *Id.* The court

1   instructed that "[d]etermining whether a complaint states a
2   plausible claim for relief will . . . be a context-specific task
3   that requires the reviewing court to draw on its judicial
4   experience and common sense." *Iqbal*, 129 S. Ct. at 1949-50 (*citing*
5   *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2nd Cir. 2007)).  The court
6   concluded: "While legal conclusions can provide the framework of a
7   complaint, they must be supported by factual allegations.  When
8   there are well-pleaded factual allegations, a court should assume
9   their veracity and then determine whether they plausibly give rise
10  to an entitlement to relief." *Id.* at 1950.

11       The Ninth Circuit further explained the *Twombly*-*Iqbal* standard
12  in *Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009).  The
13  *Moss* court reaffirmed the *Iqbal* holding that a "claim has facial
14  plausibility when the plaintiff pleads factual content that allows
15  the court to draw the reasonable inference that the defendant is
16  liable for the misconduct alleged." *Moss*, 572 F.3d at 969 (*quoting*
17  *Iqbal*, 129 S. Ct. at 1949).  The court in *Moss* concluded by
18  stating: "In sum, for a complaint to survive a motion to dismiss,
19  the non-conclusory factual content, and reasonable inference from
20  that content must be plausibly suggestive of a claim entitling the
21  plaintiff to relief." *Moss*, 572 F.3d at 969.

22                              **Discussion**

23  **I.    DWC's Standing**

24       Estampa argues that when DWC incorporated on September 5,
25  2008, they ceased to exist as a partnership and therefore lack
26  standing to bring any claims arising out of its alleged pre-
27  incorporation activities on behalf of Davis LLC. Estampa believes
28  DWC's subsequent efforts to create standing, including its

OPINION AND ORDER              9

registration to do business in Oregon two years after incorporating, are insufficient. DWC argues that the organization of Davis LLC came months after Estampa's breach in April 2008 and was a reorganization in form only. According to Cesar Bistue, although the paperwork for Davis LLC was filed with the California Secretary of State after Estampa terminated the Agreement, Davis LLC was never operational. Apparently, Cesar Bistue's "intent and understanding with his partners was that the partnership would continue at least until all federal and state permits had been transferred or obtained by the LLC." (Decl. Cesar Bistue ¶ 18.) This never happened, however, and the relevant federal basic permits and California licenses continue to be in the name of DWC.

Estampa relies on *Calkins v. Calkins*, 63 Cal. App. 292 (1923), as the seminal case setting forth the dissolution rule. In *Calkins* it was stated that:

> The law never contemplated that persons engaged in business as partners may incorporate with intent to obtain the advantages and immunities of corporate form, and then, Proteus like, become at will a copartnership or a corporation, as the exigencies or purpose of their joint enterprise may from time to time require. . . . If the parties have the rights of partners, they have the duties and liabilities imposed by law and are responsible *in solido* to all creditors. If they adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners, and have only the rights, duties, and obligations of stockholders. They cannot be partners *inter sese* and a corporation as to the rest of the world.

*Calkins*, 63 Cal. App. at 298-99 (quoting *Jackson v. Hooper*, 76 N.J. Eq. 592, 599(1910)). Estampa contends that the language quoted above requires a finding that the partnership ceased to exist for purposes of the company's interactions with third parties upon incorporation.

OPINION AND ORDER                10

1    As Estampa points out, cases outside of California have
2    confirmed as much.  For example, in *Hooper v. Yoder*, 737 P.2d 852
3    (Colo. 1987), the court indicated that the general rule is that
4    incorporation of a partnership business effects dissolution of the
5    partnership.  *Hooper*, 737 P.2d at 858 n.5.  The *Hooper* court also
6    cited *Cavasso v. Downey*, 188 P. 594 (Cal. App. 1920), for the
7    proposition that, "where partners incorporated a partnership
8    business, *and there was no evidence of an agreement that their*
9    *relationship as co-partners should continue*, the partnership was
10   terminated and merged into the corporation."  *Id.* [emphasis added].

11   According to Estampa, the key California cases relating to
12   dissolution are *Persson v. Smart Inventions, Inc.*, 125 Cal. App.
13   4th 1141 (2005) and *Cavasso v. Downey*, 45 Cal. App. 780 (1920).
14   *Persson* and *Cavasso* analyzed the rights and responsibilities of
15   former business partners *inter sese*, rather than between an entity
16   and a third party.[2]  In fact, *Cavasso* made this distinction clear
17   by stating, "[a] number of cases cited deal with the rights of
18   third parties under such circumstances, and have no bearing on the
19   instant case."  *Cavasso*, 45 Cal. App. at 786.  Nevertheless,
20   Estampa argues that, while business associates may be treated as
21   partners in relation to one another, the corporate form is to be
22   respected in dealings with third parties.  The only authorities

23

24   [2] "*Persson* (and *Cavasso*, for that matter) analyzed the rights
25   and responsibilities of former business partners against one
     another. It is clear from the case law that [this portion of the]
26   analysis does not apply to disputes between an entity and third
     parties, and it is therefore irrelevant to this Court's
27   decision. . . . Whether partners may agree to continue as partners
     in relation to one another after incorporation is not at issue
28   here."  (Def.'s Reply at 5.)

OPINION AND ORDER            11

Estampa cites in support of this argument are *Itel Containers Intern. Corp. v. Atlanttrafik Exp. Servs. Ltd.*, 909 F.2d 698 (2d Cir. 1990) and *Sagamore Corp. v. Diamond West Energy Corp.*, 806 F.2d 373 (2d Cir. 1986).

In *Itel*, Sea Containers Ltd. ("SCL") was engaged in the business of selling and leasing cargo containers to ocean carriers. *Itel*, 909 F.2d at 700.  SCL decided to purchase a shipping line (the "AES" line) and its two ships, but SCL did not want to compete openly with its container customers. *Id.*  SCL decided instead to incorporate separate entities to buy and operate the line. *Id.* SCL supplied the funds and legal fees for the creation of Elliott Maritime, whose sole shareholder was a business associate of SCL. *Id.*  Atlanttrakif Express Service Ltd. ("AES Ltd.") was incorporated as a wholly owned subsidiary of Elliot Maritime, to be the holding company of the AES liner service. *Id.*  Atlanttrafik Express Service Inc. ("AES Inc."), was formed as a wholly owned subsidiary of AES Ltd. to operate the liner service. *Id.*  Itel Containers International Corporation ("Itel"), along with others, had leased equipment to the AES line prior to formation of AES Ltd. *Id.* 699-700.  Itel eventually entered into a lease with AES Ltd. *Id.* at 700.  However, the AES operation fell apart as AES Ltd. was deeply in debt and incurring large monthly losses. *Id.* at 701. SCL refused to provide further financial assistance and AES Ltd. went into liquidation. *Id.* With AES Ltd. in bankruptcy, Itel and others commenced actions to recover payment for equipment rentals from SCL. *Id.*

On appeal, Itel claimed that the district court should have found SCL and AES Ltd. were joint venturers in operating the AES

OPINION AND ORDER              12

line. *Id.* at 701.  The Second Circuit determined that the elements
necessary to form a joint venture were lacking based, in part, on
SCL purposely using layers of corporations so that its involvement
with the AES line would be remote, and since there was no
indication they expected to share in the losses except as a lender
to AES Ltd. *Id.* at 701-02.  Furthermore, the court went on to note
that the district court correctly found that AES Ltd. itself was
not a joint venture because it was a corporation. *Id.* at 702.  In
dicta, the court stated, "a joint venture and a corporation are
mutually exclusive way of doing business. . . . Though business
associates may be treated as partners vis-a-vis one another even
when they operate through a corporation, the corporate form is to
be respected in dealings with third parties." *Id.*

In *Sagamore*, the chairman of Diamond West Corporation
("Diamond West") entered into an Equity Participation Agreement
("EPA") with the president of Sagamore Corporation ("Sagamore").
*Sagamore*, 806 F.2d at 374.  The EPA provided that a separate
entity, Diamond East Energy Corporation, would be formed to carry
out the project. *Id.* at 375.  On appeal, an issue was raised as to
whether a joint venture agreement is superseded and rendered
unenforceable by the formation of a corporation to implement it.
*Id.* at 377.  In delineating the applicable standard, the
*Sagamore* court recognized that individuals can be partners *inter
sese* and a corporation to the rest of the world, so long as the
rights of third parties such as creditors are not involved. *Id.* at
379.  However, this principle played no part in the court's
decision. *See id.* ("[I]t is not argued that enforcement of the EPA

OPINION AND ORDER            13

1  adversely affected the rights of any third parties.")  The *Sagamore*
2  court went on to determine that the terms of the EPA invoked by
3  Sagamore survived the formation of Diamond East and were
4  enforceable.  *Id.*

5      The court finds Estampa's argument concerning the dissolution
6  of DWC unavailing based on the following reasons.  First, and
7  perhaps, most notably, the parties have not cited, nor has research
8  revealed a California case, or a case from another jurisdiction,
9  where the court definitively found that a partnership ceased to
10 exist under these circumstances.  In fact, several of Estampa's
11 sources are merely persuasive authorities that offered the relied
12 upon statement in dicta.

13     Moreover, *Hooper* made the pertinent observation that, "the
14 dissolution of a partnership . . . does not automatically terminate
15 the existence of the partnership."  *Hooper*, 737 P.2d at 858.  Upon
16 "dissolution the partnership is not terminated but continues until
17 the winding up of partnership affairs is completed." *Id.* at 859.
18 This includes the process of settling the partnership affairs after
19 dissolution.  *Id.* at 859.  Under Colorado law, when partners
20 organize a corporation to continue the business of the firm, the
21 winding up of the partnership includes the transfer of partnership
22 assets to the corporation in exchange for corporate stock.  *Id.*
23 When no shares of stock are issued upon incorporation, thereby
24 winding up the partnership affairs, the partnership continues to
25 exist.  *Id.*

26     California also has applicable provisions governing the
27 winding up of partnerships.  For example, Corporations Code § 16803

28

OPINION AND ORDER                14

provides in pertinent part:

> (a) After dissolution, a partner who has not dissociated may participate in winding up the partnership's business[.]
>
> ****
>
> (c) **A person winding up a partnership's business may preserve the partnership business or property as a going concern for a reasonable time, prosecute and defend actions and proceedings**, whether civil, criminal, or administrative, settle and close the partnerships' business, dispose of and transfer the partnership's property, discharge the partnership's liabilities, distribute the assets of the partnership . . . settle disputes by mediation or arbitration, and perform other necessary acts.

Cal. Corp. Code § 16803 (a)-(c) (2006) (emphasis added); *see also* 9 Witkin Summary Cal. Law (10th Ed. 2005) Partnership, § 48 (noting that a partnership continues after dissolution for the purposes of winding up its business, which includes prosecuting and defending actions and proceedings). Similarly, a dissolved corporation "continues to exist" for the purpose of winding up its affairs, including prosecuting lawsuits to recover sums due or owing to it or to recover any of its property. *Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 212 (2010).

In short, Estampa relies on cases that provide no clear indication how a California court will resolve the precise issue involved here. The authorities discussed instead suggest and the court holds that the Bistues are entitled to preserve the partnership for the purposes of initiating a civil proceeding such as this.

## II. Contract Interpretation Under California Law

DWC claims that the parties intended DWC to be a party (or to use the precise Agreement parlance, the "Agent"), which allows them

OPINION AND ORDER          15

1  to enforce the contract.  It is alleged that Estampa understood and
2  agreed that Davis LLC would be identified as the Agent as well, but
3  DWC would perform all obligations until reorganization was affected
4  "five or six months later," or by early June or early July 2008.
5  Estampa believes that DWC is attempting to create ambiguity by
6  inundating the court with extrinsic evidence that contradicts the
7  Agreement and is barred by the parol evidence rule.

8       **A.   General Principles**

9       The  Agreement  contains  a  choice-of-law  clause  requiring
10  California's substantive law to apply.  "California recognizes the
11  objective theory of contracts, under which it is the objective
12  intent, as evidenced by the words of the contract, rather than the
13  subjective  intent  of  one  of  the  parties,  that  controls
14  interpretation." *Founding Members of Newport Beach Country Club v.*
15  *Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003)
16  (internal  citation  and  quotation  marks  omitted).  "The  parties
17  undisclosed  intent  or  understanding  is  irrelevant  to  contract
18  interpretation." *Id.*

19      The basic goal, however, it to give effect to the parties'
20  mutual intent at the time of contracting. *Cedars-Sinai Med. Ctr.*
21  *v. Shewry*, 137 Cal. App. 4th 964, 979 (2006) (citations omitted).
22  "When a contract is reduced to writing, the parties' intention is
23  determined from the writing alone, if possible." *Id.* (quoting
24  *Founding Members*, 109 Cal. App. 4th at 955).

25      **B.   The Parol Evidence Rule**

26      California's parol evidence rule is codified in section 1856
27
28

OPINION AND ORDER              16

of the California Code of Civil Procedure.[3]  *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (2004).  It "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument."  *Id.* (quoting *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1433 (1992)).  "The rule does not, however, prohibit the introduction of extrinsic evidence 'to explain the meaning of a written contract . . . [i]f the meaning urged is one to which the written contract terms are reasonably susceptible.'"  *Casa Herrera*, 32 Cal. 4th at 343 (quoting *BMW of N. Am., Inc. v. New Motor Vehicle Bd.*, 162 Cal. App. 3d 980, 990 n.4 (1984); *see also Arechiga v. Dolores Press, Inc.*, 192 Cal. App. 4th 567, 575 (2011) (a court may admit parol evidence to interpret an "ambiguous contract" under section 1856(g)).[4]

Application of California's parole evidence rule divides the court's inquiry into two principal parts, "1) was the writing intended to be an integration, i.e., a complete and final

---

[3] Section 1856(a) states, "[t]erms set forth in a writing intended by the parties the parties as a final expression of their agreement . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."  CAL. CIV. P. Code § 1856(a) (West 2007).

[4] Section 1856(g) states, "[t]his section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement[.]" *Id.* § 1856(g).  Section 1860 states, "[f]or the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the Judge be placed in the position of those whose language he is to interpret."  *Id.* § 1860.

expression of the parties' agreement, precluding any evidence of collateral agreements and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence?" *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 270 (1987) (citations omitted). "Put another way, '[i]f a writing is deemed integrated, extrinsic evidence is admissible only if it is relevant to prove a meaning [to] which the language of the instrument is reasonably susceptible.'" *Banco do Brasil, S.A. v. Latian, Inc.*, 234 Cal. App. 3d 973, 1001 (1991) (citation omitted).

### 1. Was the writing intended to be an integration, i.e. a complete and final expression of the parties' agreement?

In regard to the question of integration, the Agreement of the parties contains an expression of their intent that it supersede any and all other agreements between them and that it constitutes their entire agreement. The California "Supreme Court held . . . that such a clause, while it certainly helps to resolve the issue, does not itself establish an integration; the collateral agreement itself must be examined in order to determine whether the parties intended it to be part of their bargain." *Gerdlund*, 190 Cal. App. 3d at 270-71 (citing *Masterson v. Sine*, 68 Cal. 2d 222, 65 Cal. Rptr. 545, 436 P.2d 561 (1968)). *Id.* Proof of a collateral agreement that contradicts an express provision of the written agreement, however, is not permitted under *Masterson*. *Id.* at 271. It cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement.[5]

---

[5] In determining whether an agreement is integrated, the California Appellate Districts seem to disagree whether courts

1    Here, the parties focused their oral arguments on the guidance

2    provided by *Banco do Brasil*.  In *Banco do Brasil*, the court held

3    the integration analysis to be based on the examination of four

4    questions:

5         (1) does the written agreement appear on its face to be
          a complete agreement; . . (2) does the alleged oral
6         agreement directly contradict the written instrument; (3)
          can it be said that the oral agreement might naturally
7         have been made as a separate agreement or, to put it
          another way, if the oral agreement had been actually
8         agreed to, would it certainly have been included in the
          written instrument; and (4) would evidence of the oral
9         agreement be likely to mislead the trier of fact.

10   *Banco do Brasil*, 234 Cal. App. 3d at 1003.  DWC conceded that the

11   presence of an integration clause favored Estampa.  DWC argued that

12   the *Banco do Brasil's* second, third, and fourth factor were

13   favorable to it's position.

14   The court finds DWC's arguments unavailing.  "The crucial

15   issue is whether the parties *intended* the written instrument to

16   serve as the exclusive embodiment of their agreement." *Salyer*

17   *Grain & Mining Co. v. Henson*, 13 Cal. App. 3d 493, 498 (1970)). In

18   *Salyer*, a trucker and a farmer entered into a contract to haul

19   grain.  *Id.* at 496.  The negotiations took place between the

20   president of a large-scale farming operation and the trucker, who

21

22   _____

23   should consider if the terms of the alleged oral understanding are
     inconsistent with the written contract.  *Compare Ebensen Userware*
24   *Internat., Inc.*, 11 Cal. App. 4th at 637 n.3 (1992) (stating that,
     "the question of conflict between the written and oral agreements
25   is irrelevant to the question of integration"), *and Founding*
     *Members*, 109 Cal. App. 4th at 954 (favorably citing *Ebensen* for the
26   same proposition), *with Banco do Brasil*, 234 Cal. App. 3d at 1003
     (finding that the integration analysis is comprised of four
27   questions, including whether the alleged oral agreement directly
     contradicts the written instrument).
28

had been engaged in the trucking business for eleven years and operated six trucks. *Id.* at 501. The court found the agreement between the parties to be integrated based, in part, on the fact that the parties to the negotiations dealt at arm's length and both were experienced businessmen who may be presumed to know the effect of written agreements. *Id.*

Similarly, in this case, the negotiations were at arm's length and lasted for a three-month period during which Estampa's Export Manager, Marie Chaisson ("Chaisson") visited DWC's offices, Cesar Bistue visited the Estampa winery in Colchagua, Chile, and Estampa's CEO, Miguel Gonzalez Ortiz ("Ortiz"), visited DWC's offices and warehouse. (Decl. Cesar Bistue ¶ 4.) Cesar Bistue had been in the wine business for seven years prior to being contacted by Chaisson. (Decl. Cesar Bistue ¶ 2-3.) German Bistue also had a MBA from the University of Washington and seven years of experience in the wine business.[6] (Decl. German Bistue ¶ 1.) Accordingly, as in *Salyer*, the parties here are experienced businessmen who are presumed to know the effect of their written agreements.

Most importantly, *Banco do Brasil* made several pertinent observations regarding the presence of an integration clause that appears to be supported by California precedent. First, it was noted that the adoption and use of an integration clause by the

---

[6] German Bistue's declaration indicates he has eleven years of experience in the wine business. However, that is presumably as of the date of his declaration on May 25, 2011, rather than when negotiations began in September 2007. (Decl. German Bistue at 2, 6.)

OPINION AND ORDER          20

parties may well be conclusive on the issue of integration. *Banco do Brasil*, 234 Cal. App. 3d at 1001.  Second, "obviously, the presence of an 'integration' clause will be very persuasive, if not controlling, on this issue." *Id.* at 1003.  "It is difficult to imagine how the parties could have more clearly expressed their intent to make the written instrument a full and complete expression of their agreement" than including an integration clause. *Id.*

In short, the parties have not cited, nor has the court found any case holding that, despite the presence of an integration clause, the contract should not be found to be integrated. *See Banco do Brasil*, 234 Cal. App. 3d at 1003-08; *see also Haggard v. Kimberly Quality Care, Inc.*, 39 Cal. App. 4th 508, 518 (1995); *see also Gerdlund*, 190 Cal. App. 3d at 272; *see also Alling,* 5 Cal. App. 4th at 1435.  In fact, often times the converse is true and the California courts find an agreement complete despite the omission of an integration clause. *See, e.g., Software Design & Application, Ltd. v. Price Waterhouse*, 49 Cal. App. 4th 464, 470 (1996) (noting that, "although there is no 'integration' clause in the engagement letters, they are nonetheless complete.")  Thus, the court concludes that the Agreement is integrated.

## 2.  Is the Agreement Susceptible to the Meaning Contended for by the Party Offering the Evidence?

The second part of the inquiry is "whether the offered evidence is nonetheless admissible to explain the meaning of the contract language," under *Gerdlund*, 190 Cal. App. 3d at 272. California recognizes a broad exception to the parol evidence rule.

OPINION AND ORDER          21

"No contract should ever be interpreted and enforced with a meaning that neither party gave it," which is why "parol evidence may be introduced to show the meaning of the express terms of the written contract." *Brinderson-Newberg Joint Venture v. Pac. Erectors*, 971 F.2d 272 (9th Cir. 1992) (citations omitted).

This aspect of parole evidence rule was articulated by the California Supreme Court in *Pac. Gas. & Elec. v. G.W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37 (1968):

> The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

*Gerdlund*, 190 Cal. App. 3d at 272. The decision whether to admit parol evidence involves a two-step process:

> First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step-interpreting the contract.

*Arechiga*, 192 Cal. App. 4th at 575 (quoting *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992).

In support of its position, DWC has offered the following extrinsic evidence demonstrating the parties' intentions. The earlier drafts of the Agreement identified DWC as the Agent. (Pl.'s Opp'n at 13.) Just prior to execution on January 7, 2008, the identity of the Agent in the opening paragraph of the Agreement changed to Davis LLC. (*Id.*) Estampa, specifically Ortiz and Chaisson, understood and agreed that Davis LLC was not yet formed

OPINION AND ORDER                22

at the time of the Agreement. (*Id.*) Estampa understood and agreed that, although the Agreement identified Davis LLC as the Agent, DWC would actually conduct operations and perform work under the Agreement for at least the first five or six months or until early June or July 2008. (*Id.*) Cesar Bistue explained information concerning reorganization and DWC's role under the Agreement to Ortiz during a meeting in Colchagua, Chile and in a phone conversation with Chaisson. (*Id.*) Cesar Bistue also communicated such information to Chaisson via email on January 4, 2008. (*Id.*)

Estampa did not hesitate to allow DWC to actually commence performance once the Agreement was executed. (*Id.*) DWC in fact did commence performance, resulting in several beneficial contacts and market entries for Estampa throughout the United States. (*Id.*) Estampa's press releases, emails and Letter Appointment announcing their new Untied States importer and representatives refer only to DWC and never to Davis LLC. (*Id.* at 13-14) All invoices, purchase orders, correspondence and miscellaneous information exchanged between the parties reference DWC. (*Id.* at 14.) Estampa required DWC to purchase all it's wine stored in the United States. (FAC ¶ 13.) Estampa's legally required wine labels identify their importer as DWC. Estampa's termination letter is addressed to DWC. (Pl.'s Opp'n at 14.)

Here, the Agreement's introductory language states that, "[t]his AGREEMENT entered into as of the 7[th] day of January, 2008 is by and between . . . Estampa . . . and Davis Wine Imports, LLC, represented by Cesar Gabriel Bistue, having its business address at 606 Pena Drive, Suite 700, Davis, California, United States of

America ("AGENT" and together with [Estampa] the "Parties")." (FAC Ex. A at 1.)  Section 2.2 of the Agreement states, "The AGENT . . . is legally authorized to import alcoholic beverages in the United States under the Federal Permit CA-I-5278[.]"  (FAC Ex. A at 1.)

According to DWC, the contract is ambiguous because Davis LLC is defined as the Agent and the holder of Federal Permit CA-I-5278. However, the true holders of Federal Permit CA-I-5278 are: "Sebastian Bistue and German Bistue, dba Davis Wine Company, 606 Pena Drive, Unit #700, Davis, CA 95616." (Pl.'s Opp'n at 17.) DWC characterizes this as a specific and unmistakable reference to DWC within the four corners of the Agreement.  Thus, DWC argues that they were also the Agent (or party) and may enforce the Agreement.

In this case, the court does not find that the language of the Agreement lends itself to the proposed meaning.  According to the California Supreme Court, the parol evidence rule determines the enforceable and incontrovertible terms of an integrated written agreement.  *Casa Herrera*, 32 Cal. 4th at 345.  The written agreement is the parties' sole agreement, and it is impermissible to allow extrinsic evidence to add to, detract from, or vary the terms of such an agreement. *Id.*  The interpretation sought by DWC is that they were "also" a party or Agent under the Agreement. (*See* Pl.'s Opp'n at 12.)  As written, however, the Agreement uses the term "Agent" in its singular form, not plural.  Embracing DWC's interpretation would require the court to read "Agent" as "Agents," and to add the name of an entity that is not explicitly referenced on the face of the Agreement.  Such an interpretation runs afoul of *Casa Herrera's* mandate by adding and varying the terms of the

OPINION AND ORDER          24

1  agreement.  The evidence is not offered to explain a term of the
2  contract, nor does it support a meaning to which the contract is
3  susceptible.

4      In addition, Davis LLC was deliberately identified as the only
5  Agent under the Agreement thereby precluding alteration.  The
6  original drafts of the Agreement listed DWC as the Agent.  Cesar
7  Bistue then decided DWC might benefit from an organizational change
8  and instructed Estampa that Davis LLC would be identified as the
9  Agent in the final version of the Agreement, rather than DWC.
10  (Pl.'s Opp'n at 6.)  As Cesar Bistue stated, "[w]e can sign the
11  contract as Davis Wine Imports, LLC, then we will not have to
12  change the name."  (Pl.'s Opp'n at 7.)  Clearly Cesar Bistue
13  intended for the Agreement not to reference DWC because he wanted
14  to avoid the necessity of a name change.  Accordingly, the parties'
15  final undertaking that was deliberately expressed in writing,
16  cannot be changed.  *See Casa Herrera*, 32 Cal. 4th at 345
17  (California's parol evidence rule, "make[s] sure that the parties'
18  final undertaking, deliberately expressed in writing, shall not be
19  changed").

20      Moreover, while much is made of prior or contemporaneous
21  agreements concerning DWC's reorganization and ability to perform
22  on Davis LLC's behalf, "the act of executing a written
23  contract . . . *supersedes* all the negotiations or stipulations
24  concerning its matter which preceded or accompanied the execution
25  of the instrument."  *Casa Herrera*, 32 Cal. 4th at 344.  Thus,
26  "extrinsic evidence cannot be admitted to prove *what the agreement*
27  *was* . . . because as a matter of law *the agreement is the writing*

28

OPINION AND ORDER          25

*itself.*" *Id.* at 344 (emphasis added). Here, the Agreement fails to mention reorganization, an applicable grace period, or the fact that DWC would perform the obligations until any reorganization was affected. The court is therefore bound by the terms of the Agreement and cannot add an additional provision (party) to an integrated writing.

Finally, DWC argues that Federal Permit CA-I-5278 is "a specific and unmistakable reference to and inclusion of Davis Wine Company." (Pl.'s Opp'n at 17.) The court finds this argument unavailing. On its face, this reference is neither specific, nor unmistakable without the benefit of extrinsic evidence. DWC's evidence also demonstrates that Cesar Bistue intended to have DWC's name stricken from the Agreement and replaced by Davis LLC. In essence, DWC is now arguing for their inclusion despite the fact that they intended for their exclusion prior to execution of the Agreement.

In short, the court agrees with *Banco do Brasil* that parties to a business transaction, such as this, should be able to clearly express their intent as to the nature and scope of their legal relationship. *Banco do Brasil*, 234 Cal. App. 3d at 1001. Once the parties agree to a complete and final expression of their agreement, they are required to live with its terms. *Id.* In any event, while the court does not find DWC to be the Agent based on the contract's plain language, this result does not foreclose the possibility DWC could enforce the contract as a promoter.

### III. DWC's Status as a Promoter of the Agreement

DWC claims that in California it is black letter law that a

1  counter party can enforce a contract against a promoter of an
2  entity that is never formed. (Pl.'s Opp'n at 20.)  The case at bar
3  presents the reverse scenario.   DWC admits that California courts
4  have never squarely addressed the issue, but claims that many other
5  jurisdictions and commentators have.  (*Id.*)  DWC argues there is
6  universal agreement that promoters can enforce the same contracts
7  that could otherwise be enforced against them.  (*Id.*)

8      DWC first relies on *White v. Dvorak*, 78 Wash. App. 105 (1995).
9  In *White*, the court held that underlying every contract is a
10  presumption that the parties intended to create an enforceable
11  obligation, which extends to contracts made in the name of a
12  nonexistent corporation. *White*, 78 Wash. App. at 114.  The person
13  that purports to act as a corporation will want a binding contract
14  with the other party.  *Id.*  In the same vein, the other party
15  intends to make a present contract with an existing person.  *Id.*
16  "An enforceable contract can only exist if the person purporting to
17  act as a corporation is a party to the contract because the
18  corporation lacks existence and cannot be bound."  *Id.*  In turn,
19  even if the other party is unaware of the corporate nonexistence,
20  the presumption in favor of enforceability supersedes the silence
21  of the parties in the contract as to the effect of nonexistence of
22  an entity purporting to be a party.  *Id.*  Thus, when a third party
23  enters into a contract with a person purporting to act as a
24  corporation, the third party is bound and both parties can demand
25  performance despite the tenor of the contract suggesting the unborn
26  entity will, when created, perform the promises.  *Id.* at 114-15.

27      DWC goes on to proclaim that every single known case and
28

OPINION AND ORDER        27

commentary are in accord with *White's* holding.  For example, DWC
cites *Fish v. Tandy Corp.*, 948 S.W.2d 886 (Tex. App. 1997), for the
proposition that, "[b]ecause any enforceable agreement is mutual
and binding on both parties, logic dictates [that] a promoter who
is liable under an agreement may also make a claim under such a
contract."  *Fish*, 948 S.W.2d at 898.[7]

Estampa argues that DWC cites a number of non-binding
authorities in an attempt to establish that DWC's status as a pre-
incorporation promoter creates standing.  Notably, Estampa points
out that none of the cases cited by DWC involved a partnership as
a pre-incorporation promoter.  According to Estampa, DWC focuses on
the rights of corporate promoters in circumstances where the
corporation is never formed, which is not the case here.

In California, absent certain inapplicable exceptions,
"[p]romoters are personally liable on contracts they make in
promotion of a corporation even though the corporation after coming
into existence receives benefits from the contract[.]"  15 Cal.
Jur. 3d Corporations § 47.  "Whether or not the corporation is even
organized, and whether or not it ratifies pre-incorporation
contracts by its promoters, the promoters themselves remain
personally liable on such contracts."  Friedman, Cal. Practice
Guide: Corporations (The Rutter Group) ¶ 3:399 (CACORPS CH. 3-G).

While we are dealing with the alleged promotion of a LLC,

---

[7] DWC also cites *Island Transp.Co., Inc. v. Cavanaugh*, 767
N.E. 2d 609 (Mass. App. Ct. 2002); *Gardner v. Madson*, 949 P.2d 785
(Utah Ct. App. 1997); *T Street Dev., LLC v. Dereje & Dereje*, No.
CV-05-524-GK, 2005 WL 3466651 (D.D.C. Dec. 19, 2005); *Cinema N.
Corp. v. Plaza at Latham Assoc.*, 867 F.2d 135 (2d Cir. 1989).

rather than a corporation, *02 Dev., LLC v. 607 South Park, LLC*, 159 Cal. App. 4th 609 (2008), noted there was no authority that would support treating an LLC differently than a corporation in this respect. *South Park*, 159 Cal. App. at 610.

Generally, promoters are individuals rather than a partnership or other legal entity, which begs the question whether a partnership can be a promoter. In *MacDonald v. Arrowhead Hot Springs Co.*, 114 Cal. App. 496 (1931), promoters were defined as, "[t]he persons who, for themselves or others, take the preliminary steps to the organization of a corporation. . . . They are the ones who bring about the incorporation." *Macdonald*, 114 Cal. App. at 500 (quoting 1 Thompson on Corporations, third edition, 106, section 96). While California has no controlling cases on this issue, the court can find no reason in law or logic why partners, who are jointly and severally liable for partnerships debts, cannot serve as a promoter for an entity yet-to-be formed. It seems unlikely that partnerships are precluded from being promoters, while corporations are allowed to act in such a capacity under California law. *See* 15 Cal. Jur. 3d Corporations § 34 (recognizing that a corporation can be a promoter of another corporation); 9 Witkin Summary Cal. Law (10th Ed. 2005) Corporations, § 52 (same).

The dispositive issue thus remains whether DWC is entitled to enforce the contract they entered into with Estampa on behalf of Davis LLC. The Restatement Second of Agency § 326 ("§ 326") provides that, "[u]nless otherwise agreed, a person who, in dealing with another, purports to act as agent for a principal whom both know to be nonexistent or wholly incompetent, becomes a party to

OPINION AND ORDER          29

such a contract." Restatement (Second) of Agency § 326 (1958). The authors of the Restatement state that promoters are a classic illustration of § 326's application. *Id.* cmt. b. DWC relies primarily on the Restatement Third of Agency § 6.04 ("§ 6.04"), as the parallel provision to § 326, which provides in pertinent part:

> Unless the third party agrees otherwise, a person who makes a contract with a third party purportedly as an agent on behalf of a principal becomes a party to the contract if the purported agent knows or has reason to know that the purported principal does not exist or lacks capacity to be a party to a contract.

Restatement (Third) of Agency § 6.04 (2006). Section 6.04 applies to promoters of yet-to-be formed entities as well. *Id.* cmt. c.

DWC claims that § 326 and § 6.04's use of the term "party" suggests they are able to enforce the Agreement under these circumstances. The California courts have not explicitly adopted § 326, nor have they adopted § 6.04. However, the court predicts that if a California court was confronted with this issue, it would adopt § 6.04, and thereby afford DWC a cause of action under these circumstances. In *Bonfigli v. Strachan*, 192 Cal. App 4th 1302 (2011), the First Appellate District was faced with "no California authority directly on point" and therefore turned to the Restatement Third of Agency § 3.13, noting that they agreed with the Restatement's analysis.[8] Similarly, in this case, there is no

---

[8] California courts have applied the Restatement Third of Agency in other contexts as well. *See Tvberg v. Fillner Const., Inc.*, 49 Cal. 4th 518, 528 (applying Restatement Third of Agency § 3.15); *see also Messenger Courier Ass'n of Ams. v. Cal. Unemployment Ins. Appeals Bd.*, 175 Cal. App. 4th 1074, 1090 (applying Restatement Third of Agency, Introduction, Common Law and Statutes); *see also Phillips v. TLC Plumbing, Inc.* 172 Cal. App. 4th 1133, 1139-40 (applying Restatement Third of Agency § 7.05 and

precedential authority to draw upon and the Restatement Third is both relevant and instructive.   The court will therefore apply § 6.04 to the case at bar.

In sum, the court agrees DWC is able to bring an action to enforce the Agreement under § 6.04.

**IV.   Whether the Agreement was Unlawful**

Estampa claims that, even if DWC is able to enforce the Agreement, the Agreement still had an unlawful purpose and an unlawful object. Specifically, Estampa argues that the Agreement called for nationwide importation of their wines, and DWC lacked the requisite licenses to lawfully comply with this obligation. DWC counters by arguing that the Agreement did not require them to import wine into all fifty states, and the only license they were required to possess was Federal Permit CA-I-5278.   According to DWC, they only needed to import wine into California, store it in a warehouse, and then sell it to third-party distributors who re-distribute the wine throughout the United States.   DWC alleges that such a practice is both legal and customary in the wine industry.

Estampa's arguments are unavailing.   First, Estampa's own statements concerning the nature of the parties' arrangement contradicts their position. For example, on January 24, 2008, Chaisson sent an email to a New Jersey distributor, explaining Estampa's relationship with DWC. (Decl. German Bistue ¶ 10.) Within the email, Chaisson indicated that "Davis Wine Co. fit all of [our] necessary criteria for representing Estampa . . . on a national level." (*Id.* Ex. 15 at 1.)   Chaisson also  stated that, "starting

commentary).

OPINION AND ORDER              31

1 March 1st , all orders must be sent to dwc@daviswine.com and *orders*

2 *will be shipped out of Davis Wine Co.'s warehouse in West*

3 *Sacramento, California*." (*Id.* Ex. 15 at 2) (emphasis added).

4     In addition, the Agreement itself supports DWC's position.

5 Estampa relies heavily on section 3.3 of the Agreement, which

6 states: "For PRODUCTS shipped directly from Chile to CLIENTS, AGENT

7 will continue as the legal importer and exclusive representative of

8 the PRODUCTS." (FAC Ex. A at 2.)[9]  Estampa argues it is

9 conceivable that DWC would have been required to import into states

10 besides California, which would have been unlawful. The Agreement

11 defines "CLIENTS" as "all wholesale or retail clients, with legal

12 license to buy and resell alcoholic beverages in the TERRITORY

13 [*e.g.,* all fifty states], that have been designated by the AGENT to

14 sell the products." The language seems to suggest that the Bistues

15 had discretion in designating what clients could sell the products

16 and thereby avoid any unlawful importation.  Section 2.3 of the

17 Agreement also states that, "it shall . . . be the responsibility

18 of the AGENT to . . . complete all the legal formalities and

19 compliance procedures for the importation and sale, both federal

20 and state." (FAC Ex. A at 1-2.)  The court reads this section as

21 providing DWC an opportunity to obtain all licenses and permits

22 necessary to their importation duties.  Accordingly, the Agreement

23 is lawful and any contrary argument by Estampa conflicts with their

24 own admissions.

25 *///*

26

27     [9] "PRODUCTS" is defined as the products produced or sold by

28 Estampa under the brands Estampa and Estacion.  (FAC Ex. A at 1.)

OPINION AND ORDER              32

**V. The Timeliness of DWC's Claims**

Next, Estampa argues that the applicable statutes of limitations for DWC's breach of the implied duty of good faith and fair dealing, breach of implied contract, and unjust enrichment claims have expired. (Def.'s Mem. Supp. at 15.)  According to Estampa, under California law, the duty of good faith and fair dealing, and a right based on an implied contract are subject to a two year statute of limitations.[10]  Estampa contends that the alleged injury to DWC took place on or around April 14, 2008, and since DWC did not bring suit until April 1, 2011, their claims are barred.  Estampa claims that Federal Rule of Civil Procedure ("Rule") 17(a) permits a relation-back for a real party in interest, but DWC fails to qualify for this exception because it is not a contract beneficiary under the Agreement.

Estampa's argument misses the mark.  Davis LLC sued Estampa in Oregon state court on July 20, 2009.  Estampa removed the case to federal court on June 8, 2010.  On August 16, 2010, Davis LLC filed a motion seeking to amend the complaint to join DWC.  Davis LLC's motion was granted on March 11, 2011.  On April 1, 2011, Davis LLC and DWC filed the FAC.  The issue then is whether DWC's claims under the FAC relate back to the filing of the original complaint.

As indicated above, DWC continues to exist and is entitled to attempt enforcement of the Agreement.  The court need not address

---

[10] Estampa relies on *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285 (9th Cir. 1987), *Smyth v. USAA Property & Casualty Ins. Co.*, 5 Cal. App. 4th 1470 (1992), *Pac. Employers Ins. v. Hartford Acc. & Ind. Co.*, 228 F.2d 365 (9th Cir. 1955), for the applicable statutes of limitations.

whether DWC is a contract beneficiary.   Rule 15(c) is the applicable rule and it provides, "[a]n amendment to a pleading relates back to the date of the original pleading when . . .the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out-- or attempted to be set out-- in the original pleading[.]" FED. R. CIV. P. 15(c)(1).   The Ninth Circuit has indicated that:

> An amendment adding a party plaintiff relates back to the date of the original pleading only when: 1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff.

*In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996) (citing *Besig v. Dolphin Boating & Swimming Club*, 683 F.2d 1271, 1278-79 (9th Cir. 1982)).   "Notice from a previous complaint is seldom adequate when substituting plaintiffs, unless the change merely brings in the real party in interest or accomplishes some similar technical result."  *Besig*, 683 F.2d at 1278.   "Unless the substituted and substituting plaintiffs are so closely related that they in effect are but one, an amended complaint substituting plaintiffs relates back only when the relief sought is sufficiently similar to constitute an identity of interest."   *Id*. (citations omitted).

Here, I find that DWC and Davis LLC are essentially the same entity, or are "in effect but one."   Further, Estampa is not prejudiced because they have been provided ample notice and there is an identity of interests between Davis LLC and DWC.  *See Raynor Brothers v. Am. Cyanimid Co.*, 695 F.2d 382, 384 (9th Cir. 1982)

OPINION AND ORDER                  34

(finding that the identity-of-interest requirement of Rule 15(c) was met because "[t]he circumstances giving rise to the claim remained the same [under the amended complaint] as under the original complaint.") Estampa relies heavily on *Besig's* language that, "[a]n amendment changing plaintiffs may relate back when the relief sought in the amended complaint is identical to that demanded originally." *Id.* However, *Besig* provided context to that statement by stating, "[i]n such a case, *despite lack of notice* [of a new plaintiff and its claims], the defendant is not prejudiced because his response to the action requires no revision." *Id.* (emphasis added). Estampa has been provided notice in this case, however. Thus, *Besig* would not require an identical complaint in this instance.

In sum, the relief sought under the FAC is sufficiently similar to the original complaint to satisfy *Besig*. As a result, the amendment adding DWC to this case relates to original pleading and DWC's claims are timely.

## VI.  The Implied Contract Claim on its Merits

As an alternative to their express contract claims, DWC claims a breach of implied contract. Estampa argues that whether a contract is expressed or implied, it must entered into by parties with legal capacity and it must have a lawful purpose. Here, the court has already determined that the Agreement had a lawful purpose and that, although Davis LLC lacked capacity, DWC was entitled to enter into contracts on its behalf as a promoter. The court therefore finds Estampa's argument unavailing. This motion is denied.

OPINION AND ORDER                35

**VII.  DWC's Unjust Enrichment Claim**

Next, Estampa argues that, under California law, there is no cause of action for unjust enrichment, citing *Durrell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010).  And, to the extent DWC seeks restitution, Estampa argues that such claims must rest on an implied contract claim. Estampa's position is that an implied contract claim is time barred and, in any event, "DWC lost nothing and there is neither evidence nor truth to the notion that Estampa was enriched."  (Def.'s Mem. Supp. at 17.)  In fact, Estampa claims that, between the parties, they incurred the greater expense and DWC experienced the greater enrichment.

In California, unjust enrichment is synonymous with restitution. *Durrell*, 183 Cal. App. 4th at 1370.  Restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it is unenforceable or ineffective for some reason. *Id.*  In this case, DWC's unjust enrichment claim is in the alternative to its breach of contract claim.  The court has determined that DWC may attempt to enforce the contract as a promoter.  The parties concede that if there is an enforceable contract, there is no claim for restitution.  However, at this stage in the proceedings, DWC is entitled to plead its restitution claim in the alternative.  Estampa's motion is therefore denied on this ground.

///

///

///

///

OPINION AND ORDER              36

**Conclusion**

For the reasons stated above, Estampa's motion [36] for summary judgment or, in the alternative, to dismiss DWC's claims for breach of the implied covenant of good faith and fair dealing, breach of implied contract, and unjust enrichment, is DENIED.

IT IS SO ORDERED.

Dated this _13th___ day of October, 2011.

/s/ Dennis J. Hubel
_____

Dennis James Hubel
Unites States Magistrate Judge